Turn to our next case, which is the Constitution Pipeline v. Seagos et al. case. Let's just take a second until everybody gets settled in and the courtroom quiets down a little bit. Okay, all set. Thank you. Good morning. May it please the Court, my name is John Stowiak. I represent Constitution Pipeline. This is a case where the record demonstrates that the state agency involved here, the New York State Department of Environmental Conservation, DEC, acted arbitrarily and capriciously and abused its discretion and failed to comply with requirements of federal law, both the Natural Gas Act and the Clean Water Act, by unreasonably delaying and then denying the application for a water quality certificate based upon a claim that DEC had not gotten sufficient information to make a determination. I want to take on this based upon the Islander East two-part test, which was a Second Circuit decision, where, in these types of appeals, you look at whether, first, the agency acted inconsistently with requirements of federal law. That's a de novo review. Then you look at whether they acted arbitrarily and capriciously. And here, its denial, here, DEC's denial, fits squarely within all the hallmarks of the three standards for what is arbitrary and capricious that were outlined by Judge Kearse in her dissent in the first Islander East case. These are classic examples of arbitrary and capricious actions. I have a little bit more of a preliminary question for you. Why aren't you in the D.C. Circuit on the waiver issue? Your assertion is that because New York took so long, that this constituted a waiver. You use the term failed to act. In fact, you even cite the language of 717RD2. And yet, that very section says that where the issue of an alleged failure to act by a state administrative agency acting pursuant to federal law to issue, condition, or deny a permit required by federal law, the action has to be brought in the D.C. Circuit. Why aren't you there? We're here because the DEC did act when it denied the water quality certificate. So there is no waiver then? Well, we believe they unreasonably delayed it, and that's inconsistent. Well, you made a waiver argument in your brief. I did. And I need to know the jurisdictional basis on which I can decide that. The jurisdictional basis is that you're entitled to consider under D.1 the action of the DEC and whether or not it was consistent with requirements of federal law. That sounds like a merits argument on whether the DEC did or did not deny the permit or the clean water permit as allowed by the statute as opposed to that their failure to act constituted a waiver in that regard. Well, one of the conditions of the Clean Water Act is that they have to act within a reasonable period of time. Right. And not to exceed one year. Right. But the statute is fairly specific. It says where a party seeks review of an alleged failure to act by the state, pursuant to federal law, doesn't say just any law. It says federal law. However, Congress has vested D.C. Circuit with exclusive jurisdiction. I think there's a reason for that. Did you ask the Army Corps of Engineers when the state denied the permit, did you ask them to deem the permit denial waived? No, we did not. Why not? Because we felt the appropriate jurisdiction would be to challenge the denial in this court. Yeah. Wait a second. But pursuant to the EPA regulations, it's the district engineer who determines whether a longer period is required with regard to a reasonable period of time for the state to act. Right. Those regulations provide a guidance. Right. They say 60 days unless the district engineer indicates otherwise. Unless the district engineer indicates otherwise. It seems to me that implies that the district engineer ought to be in the mix with regard to the determination. Well, in the Fourth Circuit case of AES Sparrows, there was an appeal directly to the Fourth Circuit. Yeah, and the Fourth Circuit said nothing about jurisdiction. Subsilentio, dealing with issues, is not an affirmance or a determination of a substantive issue. So AES Sparrows is of no help to you, at least for my money. So what is it then? From the waiver, I'm more than happy to, and I think of merits issues. Okay. But on the waiver issue, I just don't see how we have jurisdiction to even entertain it. Well, let me go back and make the arguments on the merits, which I think overlaps. All right. So I take it you're a little concerned that we do have jurisdiction. Well, I believe we took the appropriate action appealing to this circuit as opposed to the D.C. Circuit. As to the merits, I agree. I would agree 100 percent. But as to the waiver issue, I think you're in the wrong place. Well, we think based upon what we saw as a precedent in AES Sparrows and what we think is they're required under Islander East to be consistent with the requirements of federal law, we think we have a basis to make that argument. Well, I would agree with you. There's not much guidance anywhere. There is not. Okay, fair enough. Go ahead. I agree with you there. So to go back to what is arbitrary and capricious and the hallmarks of that, and Judge Kirsch laid that out pretty clearly in her dissent in the Islander East case, it's where D.E.C. took an action that was beyond what Congress intended or D.E.C. failed to consider an important aspect of the issue or D.E.C.'s decision and reason for denial runs counter to the evidence. And I'm going to take those in reverse order. You have a denial April 22, 2016. The denial is based upon a lack of sufficient information. There is no determination that we don't comply with any of the water quality standards, the EPA-approved water quality standards. They say they lack information to do that. If you look at the record and if you look at the fact that on July 20, 2015, the D.E.C. and this is in the joint appendix at 2219 and 2220 and then 2221 through 4-1, they send an e-mail to the Army Corps saying, hey, Army Corps, would you please look at the conditions that are attached to your overall and determine if they might conflict with what you have in mind, or if there are issues that you're concerned about that don't show up here. Provide us comments by the end of next week. This is July 20, 2015. And then they say don't circulate this around to anybody other than yourself and your staff. It's a secret document. And when you look at the document, the conditions, the water quality certificate, draft water quality certificate, it goes on for 21 pages of 113 conditions. There are 14 conditions on erosion and sedimentation control. There are 15 conditions on wetlands. There are 30 conditions on stream crossings, including a chart that lays out at page 17 of the draft water quality certificate, the streams that are going to be required to be crossed using a trenchless crossing method. That was a great debate about that. What that indicates very clearly is that D.E.C. had, as of July 20, 2015, sufficient information to circulate to a federal agency a draft water quality certificate that has great detail. They can't then, nine months later, issue a denial, and in those intervening nine months not ask for one single piece of information from the applicant, Constitution Pipeline, about any of the issues that are before it in the denial. Wetlands, stream crossings, blasting, pipe depth, none. You won't find a single piece of paper in the record where they ask after August 1, 2015, for any information on those issues. But then they claim on April 22, 2016, nine months later, we lack sufficient information. That's inconsistent with what's in the record and runs counter to what's in the record. I know we've had a lot of questions for it, but why don't you take two more minutes, and I won't hold that against you for the rebuttal so you can get to the points you wanted to make. The second thing is, and this requires you to look at the record. They say they lack sufficient information, but they fail to even mention in their denial letter these things that are in the record. There is a stormwater pollution prevention plan, which lays out the design to comply with water quality standards. Isn't there an objection as to whether that's actually in the record or not? No, that is in the record. That's in the USB ports, and the site is at page 59 of our opening brief with the specific site there. There's a responsiveness summary to their question, to the comments that came in as part of their process that we prepared. That's at Joint Appendix 2132 through 2141. There is a final trenchless feasibility assessment matrix that they never talk about. That's at Joint Appendix 2148 through 2155. There is an attachment J to the joint permit application on water body and wetland impacts master table, which identifies the New York State best management practices and contains alignment sheets for each crossing. That's at Joint Appendix 2379 through 2403. There is an attachment- I know that those are important as well. But that's the scope of the state's authority under the Clean Water Act. You say in your brief that Niagara-Mohawk is still good law, but it seems that that's not the case, and the New York courts have seemed to agree on that, that there's more expansive authority now given by Warren v. Maine, the United States Supreme Court. I've read all that, and you seem to be wrong about that. Tell me why I'm wrong about my reading of those cases. Well, Niagara-Mohawk was the court of appeals, and they made it clear that they cannot go past EPA-approved actions. You go to 2007, after Bud One, after Warren, and in East Niagara Power Project Alliance, there is a specific statement that that still stands, the Niagara-Mohawk standard still stands, and you are not permitted to go past those. And what was that case? That case is Eastern Niagara Project Power Alliance, which is a third department appellate division, 2007, where the court agreed with the New York Attorney General's Office in a brief filed by then Attorney General Cuomo, saying that contrary to petitioner's assertions, there was an applicant, we find DEC was justified in declining to further consider these concerns about ice booms, shoreline erosion, bird mortality. But East Niagara said that there's plenary authority under Section 401 in the state as regulating any activity altering the integrity of water. How does that constrict 401 again? Well, their authority is only by what's EPA-approved under the Clean Water Act, an EPA-approved water quality standard, not all the environmental sections that the state has. But that's not what Warren v. Maine said. No, well, Warren v. Maine was in a hydro context. You're talking about a limitation of the Natural Gas Act, an overlay of the Clean Water Act. When you read those two together, you're limited to what are EPA-approved water quality standards in terms of considering that. Well, that's in terms of – well, say you're right. That's in terms of granting or denying it, but the statute clearly allows the state agency to condition, when granting it, imposing additional conditions that may not necessarily speak specifically to water quality for approval, does it? Yes, it does. And there's a difference between the right to condition and a right to deny. A right to condition allows us to then appeal from that condition. Or to meet it. Or to meet it. We have a choice. Here we have no choice. What we have is – That's because your view of Warren v. Maine is it's a 1341D condition. Right, that's right. The language seems more expansive than that. I think it's limited to that language. They have the right to condition. They do not have the right to deny. And we have the right to then make a choice, to appeal whether the condition is improper or to accept and operate under the condition. Instead, we have, to not be too pejorative, a rope-a-dope denial, which says you didn't have sufficient information, which we think is just absolutely untrue for the reasons I've articulated. And it's also inconsistent, the denial, because at page two they talk about routing as one of the fundamentals. They were upset because we didn't pick a route that went on the access area of Interstate 88. That was fully vetted and discussed in great detail, including nine comment letters from the DEC to the FERC about what was the appropriate route. And as this court in National Fuel Gas said, routing is exclusively within the province of the Federal Energy Regulatory Commission. It is not within the province of the State Public Service Commission in that case or the State Department of Environmental Conservation in this case. That's inconsistent with the requirements of federal law. And that's another reason why this should be overturned. And our request for relief is that you should remand, you should declare it void, and I'll come back to that and say, if I can, on rebuttal, the waiver argument. But you should remand this case and direct them to issue the certification that they sent to the Army Corps on July 20, 2015, within five days or 20 days, whatever is a reasonable time, and declare the denial void. Thank you. Mr. Lear? You're from the state at this point? Good morning, your honors. May it please the court. Brian Lusignan with the New York State Office of the Attorney General, representing the state respondents. DEC's denial in this case was reasonable, not arbitrary and capricious, and fully supported by the record. DEC also acted well within its broad discretion under Section 401 of the Clean Water Act, and its denial was timely. DEC's conclusion that Constitution failed to establish that the project would comply with state water quality standards is fully supported by the record and is not arbitrary and capricious in this case. The scope of DEC's review here was really driven by the scope of the project that Constitution was proposing to build. This is 100 miles of new right-of-way across central New York State, crossing more than 250 stream locations, 87 of those locations supporting trout or trout spawning, and negatively affecting more than 80 acres of wetlands. Constitution, throughout this administrative process, had the burden to establish that this massive project would comply with state water quality standards and requirements. This is a burden they failed to meet because they repeatedly failed to supply information that DEC determined it needed to determine that the project would comply with state water quality standards. DEC repeatedly expressed its preference for what are called trenchless crossing methods, which would drill the pipeline under the streams without disturbing the stream banks or the stream flow. Dating back to June 2012, DEC indicated it wanted this process evaluated for every stream crossing. The trench methods that Constitution is proposing to use for most of the crossings would essentially cut directly through the stream, seriously injuring, destroying the stream bed during construction and having long-lasting impacts on erosion and affecting the flow of the river in the long term. Again, DEC requested evaluation of trenchless methods at all 250 stream crossing locations. In response, Constitution categorically eliminated 90% of crossings from any consideration for trenchless feasibility. Constitution's basis for this was... I don't know where you're going with this, but you went back and forth and you finally settled on a group of them and you say that they still didn't give you the substantial information that you needed as to the group that you ultimately settled on, right? There's no document in the record reflecting that Constitution and DEC had agreed that only a set of... Oh, there's an awful lot of documentation that you were narrowing the field. Please, I've taken the time to read the whole doggone thing, so please don't suffer me that. Are you telling me that my characterization of the record is wrong, that you didn't engage in a process whereby you ultimately settled on 21 or 25 streams? No, Your Honor, there was no agreement specifically that those 20 to 25 streams were the only ones that had to use trenchless crossing methods. Constitution repeatedly failed to submit evaluations for 90% of the stream crossings. So DEC staff, in their attempts to elicit information to continue a dialogue on this permitting process, agreed... You were denied to permit by saying that you required trenchless procedures on all 251 streams, but that's not what you did. You said you didn't have enough to evaluate it with regard to the streams that were proposed, right? And that's not what DEC requires. DEC isn't requiring trenchless crossing for all 250 streams. Oh, okay. DEC's asking for some evaluation on the 90% of streams that Constitution categorically excluded because it determined they weren't wide enough to warrant this. Let me ask you then, and maybe something that's obvious that I've overlooked, why did you consider the application complete if you didn't have the information to make the evaluation? The notice of complete application is an administrative determination that triggers the public comment period. I know, but until you know exactly what you're going to let happen, the public is going to be commenting on something that's a wish. I mean, you're actually hoodwinking the public, aren't you? Because you don't know for certain what the project's going to be. Why did you decide that the application was complete and then turn around and deny it because you didn't have enough information? I don't get it. Because the notice of complete application, Your Honor, does not restrict DEC's ability to continue gathering information. The notice of complete application means there's enough information essentially to begin DEC's review, essentially there's enough information for the public to respond meaningfully to the proposal. And in this case, DEC received 15,000 comments from the public on this project. And part of what DEC was doing in the time period when Constitution claims it was silent is reviewing these 15,000 comments. Additionally, Constitution submitted a revised application in September of 2015 that required DEC review. Moreover, during this time period, DEC was continuing to engage with Constitution on issues that were relevant to the 401 certification. What about that? They say that you didn't talk about anything for the period from August 15 to April 2016 when the decision was rendered. They say there was no discussion, there were no discussions, no documents. Is that true? That's not true, Your Honor. There were two rounds of comments that DEC issued on a third-party monitoring plan that Constitution was developing. Constitution responded to those comments and those issues were ultimately resolved, but that was part of DEC's review of this Section 401 certification. Additionally, Constitution was applying for permits to conduct evaluations on the feasibility of trenchless crossing methods at the streams it had agreed to do this on, and DEC issued those permits. Nonetheless, Constitution only ever submitted two of these detailed evaluations, and that was another aspect of the information that DEC did not have in this case to make a decision. DEC acted as well within its broad jurisdiction here to ensure that federal projects comply with state water quality standards and requirements. So you want to talk about that issue I was asking about with Niagara-Mohawk? Is that still good law in New York? No, Your Honor. Why not? Niagara-Mohawk has been essentially overruled by POD No. 1, and what POD No. 1 held is that states can impose conditions on projects under Section 401 to ensure that project activities will preserve state-designated usages for waterways. That's exactly what DEC was trying to do here. However, DEC did not receive sufficient information to even be able to formulate conditions necessary to protect state water quality. Do you have that expanse of authority? Well, no, Your Honor, because as in this case, if there's not enough information to even create conditions that will protect water quality, necessarily Section 401D requires conditions that are necessary to ensure compliance with state water quality standards. If no such conditions are possible or if the agency lacks information to create such conditions, the permit can't be issued. And in this case, DEC was attempting to create conditions that would allow this permit to be issued. Constitution has referred to the draft permit. Constitution has failed to mention that the cover letter for this draft permit said it was very preliminary, subject to significant change. As he mentioned, it was heavily conditioned, and it shows DEC's willingness to attempt to create a permit that would be satisfactory to DEC and ensure that water quality standards would continue to be met. Ultimately, however, DEC determined it did not have enough information to make that determination, and it determined not to issue that permit. It's important to note that DEC's review here, for a project of this scope, it requires multiple levels of internal DEC review. So some members of DEC staff are soliciting information, offering comments to Constitution, attempting to give Constitution more opportunities to provide necessary information. But at a certain point, all the information has to be gathered together, and a decision has to be made on whether a certification can issue. I presume you're wrong in that the New York Court of Appeals' understanding of the statute is still good law. Is there anything in any of the denials, of the basis for denial, that lines up with EPA-approved water quality standards that the DEC denied the permit on? Yes, Your Honor. The vast majority of the denial relies on water quality standards that no one can test are properly subject to 401 review. Those are in 6 NYCRR parts 701 through 704. Specifically, 701.1 refers to preventing the discharge of waste that will affect the best usages of waterways. 703.2 includes narrative standards regarding stirring up a sediment or turbidity, as well as affecting the flow of water bodies. Am I right? I mean, that was the core of the trenchless crossing issue on the turbidity issue, wasn't it? That's exactly right, Your Honor. The trench methods increase turbidity, divert the flow of these waterways, and affect their usages for fish propagation as well as human recreation. I see that I'm out of time, Your Honor. We'll rest on the brief on the waiver issue, which we don't believe is properly before this court anyway. If I just may conclude, DEC's review in this case was timely, transparent, and consistent with the state's important role under Section 401. I ask that you dismiss the petition. Thank you. Thank you. And Ms. Paulson? You don't look like Ms. Paulson. I am not Ms. Paulson. Very observant, Your Honor. To return to your local rules, though, I am required to introduce Ms. Paulson. So my name is Todd Oman. I may please the court. I'm a supervising attorney with the Pace Environmental Litigation Clinic, and I'm pleased to introduce one of our student interns, Cara Paulson, who will be arguing for a stop to pipeline today. Ms. Paulson? Sure. Thank you. I think that's okay. Thank you. ADA compliant. I didn't know being short was a disability, but may it please the court. Cara Paulson on behalf of Stop the Pipeline, which I refer to as STP. In light of today's limited time, I would like to focus on two issues in STP's brief. First, I will discuss the importance of public participation and the record in the water quality certification process. And then I will discuss reasons why the Niagara Mohawk case cited by the company is not controlling or dispositive here. The company applied for a water quality certificate, and as this court held in Islander East, the company has the burden of proof to supply pertinent information to prove that it will comply with water quality standards. This burden was not met, as evidenced by DEC's denial and the record. DEC asked for numerous categories of information, which the company never provided. STP pointed out this lack of information, and there is nothing in the record to resolve the gaps in the record. Instead, the company tries to resolve these issues with private conversations and assurances with DEC. However, these conversations and assurances are not within the record, and this court cannot rely on that information to overturn DEC's denial. As stated by DEC, close to 15,000 public comments were submitted, just as the Clean Water Act and state law intended. And those public comments identify legal and factual reasons why the water quality certificate should be denied and point to the insufficiency of information provided by the company. STP itself submitted three extensive comments identifying issues such as lack of information related to stream crossings, lack of information regarding wetlands impacts, as well as lack of studies related to aquatic species. In fact, these issues raised by the public and STP have never been resolved and are reflected in DEC's denial. For example, in the denial on page JIA-2860, DEC cites that cumulative impacts from the project have profound loss of habitat and changes in thermal conditions and erosion, instability, and turbidity. And as pointed out by DEC, that there is lacking of site-specific information for each of these 251 crossings. This information is also in STP's three extensive comments. The company's position that private meetings and assurances with DEC can overcome these gaps, as pointed out, belittle the public's role and, most importantly, are outside of the record. There is no basis in the record for this court to overturn DEC's denial and, therefore, the denial should be upheld. With respect to the second issue, the company cites Niagara-Mohawk to claim that DEC acted outside of its authority during its water quality certificate review. In Niagara-Mohawk, the Court of Appeals held that DEC can only consider federally approved water quality standards during a water quality certificate review and decision. However, this is not controlling or dispositive here. And even if Niagara-Mohawk is good law, because of the critical differences, it is not controlling or dispositive. For example, in Niagara-Mohawk, DEC requested information on nine state laws that were explicitly not related to water quality standards. In contrast here, the DEC requested information that is explicitly related to water quality standards, such as stream crossings, whereas in Niagara-Mohawk, it was related to dam safety. So is Niagara-Mohawk still good law? STP does not believe that Niagara-Mohawk is good law because of the PUD case, where the Supreme Court held that the Clean Water Act Section 401 gives states broad authority and are allowed to consider impacts unrelated to the discharge itself, as stated previously. It would produce an odd result if it's not, is it? Because then the state could say, well, all the water quality standards have been met, but we're going to deny the permit because we're concerned about something that's not directly related to water quality, but is relevant with regard to some considerations, like say, for example, the blasting issue. Say the blasting issue wasn't directly related to water quality. That would be an odd result where the state says, oh, the water quality won't be affected, but we're going to deny their permit. Now, PUD says that you can read the statute broadly in terms of what can be their concerns. That doesn't negate Niagara-Mohawk, does it? No, Your Honor, but as this court held in Islander East, it actually upheld the denial of a water quality certificate related to construction techniques that are similar to blasting in this case. I agree with you, and I ask the state's attorney. There's discussion. One of the reasons why they denied the permit was they couldn't evaluate the effect of the trench, whether the dry cutting through the streams would affect turbidity of the water, and they wanted further evaluations with regard to the trench list stuff. It's one thing to say that that's a water quality issue. I think they're hard to rebut that. But as to other issues that aren't water quality related, it's one thing to say that you could condition compliance with that because they're related and appropriate state concerns, but you grant the permit. The conditioning is when you grant the certification. That's what the statute says. The certification can be conditioned upon other statutes, and PUD tells us read that broadly, right? Correct, Your Honor. The state can condition instead of denying, but in this case, the DEC requested information on various water quality issues, and at that point might not, I cannot speak on behalf of DEC, but might not have known whether or not it would actually condition the water quality certificate or deny it. Well, we certainly know that at least one aspect of the denial seems to appear to be related to the inability to determine turbidity levels, which are directly related to EPA Clean Water Act issues, right? Correct. All right. I see I'm out of time. May I briefly conclude, Your Honor? Yes, go ahead. Therefore, we do not believe that Niagara Mohawk is controlling or dispositive, and DEC acted within its authority under the Clean Water Act when reviewing the company's water quality certificate, and ultimately the company's petition should be denied. Thank you. Ms. Naismith, you next? Ms. Naismith. If I may. There's signage. It's good. Thank you. Yes. Thank you. May it please the Court, my name is Maneen Naismith with Earth Justice, arguing on behalf of intraveners Catskill Mountain Keeper, River Keeper, and Sierra Club. And I wish to return to a couple of the points that have come up across the various arguments this morning. With respect to Niagara Mohawk and the scope of the Clean Water Act, the panel has questioned whether Niagara Mohawk is good law. And I would point out two things. First of all, Niagara Mohawk, even if it is good law, is entirely distinguishable from the situation here because DEC and Niagara Mohawk was attempting to make a 401 determination based on issues that were completely divorced from water quality standards. That is not the situation present here. As the panel has already recognized, there were questions of turbidity raised. As my counsel here for DEC has recognized, there are plain citations to EPA-approved water quality standards at the heart of this denial. And therefore, even if Niagara Mohawk is still good law, it isn't the same set of circumstances presented in this case. Moreover, in Islander East 2, this court recognized that there are issues that are related to water quality that may not fall squarely within a water quality standard. For example, in Islander East 2, there were concerns about anchor strikes and cable sweeps. And this court found that those were perfectly legitimate bases to deny a water quality certification because of the implications those actions would have on things like turbidity. And things like blasting a stream apart or crossing a stream with a trench three instead of one time or multiple times, and things like pipe burial depth, clearly are just as related to water quality standards as anchor strikes and cable sweeps. Moreover, Islander East 2 also illustrates that the question that counsel for Constitution raised, that there's some sort of special consideration appropriate here because of the overlap between the Natural Gas Act and the Clean Water Act, simply does not hold given this court's holding in Islander East 2, which had a natural gas pipeline at issue that had been approved by FERC, but that nevertheless this court recognized the clear authority the state of Connecticut had that the Natural Gas Act preserves under the Clean Water Act. I'd also point out that the characterization by Constitution's counsel of alternative M as a basis for the decision in this case is not supported if one actually reads the denial carefully. The alternative M issue is raised three times and at most is perhaps an alternative ground for the denial. It is not the heart of the denial itself. And if this court found that the consideration of alternative M was inappropriate in this case, it does not go to the heart of the denial and it is not alone a basis for overruling the denial, as this court again found in Islander East 2 where there were issues that this court found that the state of Connecticut, had it rested on those issues alone, would have not been a sufficient basis for the denial, but that there was enough in Connecticut's do-over to form a legitimate basis for denial. Also, just returning to the question of the waiver, the issue is not only the lack of jurisdiction that this court has by virtue of the Natural Gas Act, but also the Army Corps of Engineers has already weighed in on the fact that a waiver did not occur here. And the proper remedy that Constitution had was, first, it could have in the 16 months since its first moment where it claims a waiver occurred to the moment that the denial was issued. It could have gone to the Corps. It could have gone to FERC or both and asked either agency to find a waiver. It did none of the above. There's just not a lot of case law that kind of charts the course for us on this. And AES Sparrows, I mean, your opponents cite that, and I don't blame them for citing that. I would, too, if I would. Any court, you know, in a tough storm. But tell me, I mean, the Army Corps letter denying the letter of May 11, 2016, which is in the appendix at 2863, just denies the permit. Well, it denies the permit on the basis of the fact that no 401 certification exists. Right, but, I mean, is it your view of the way this thing works, that if they wanted the Army Corps of Engineers to say it's waived, then that was the place to ask for it? Yes, Your Honor, and they had, as I mentioned, they had multiple months before DEC issued the denial, and then they also had several weeks between when the denial was issued by DEC and the 404 denial came out to go to the Corps and say we think they took too long, and then if the Corps had come out with a decision that the Constitution disagreed with, they could have litigated that issue in front of the Corps. It seems to me that that's why it's placed in the D.C. Circuit, because the Army Corps, it's kind of a straight-up administrative thing, and the argument is waiver or non-waiver. I suppose if the Army Corps had made a determination that there was a waiver, and New York thought there wasn't, I suppose New York could have sued in D.C. Circuit. So it's an odd way, but I'm trying to make sense of the statute. Now, if it's just the question of the appropriateness of the denial in terms of that New York did or did not, New York's action was or was not arbitrary and capricious, that's for us to decide. Yes, Your Honor. We're dealing with New York regulations all the time, and so therefore the statute kind of sets up this duality with regard to jurisdiction on the types of issues, depending upon either waiver or merits, right? Yes. I mean, it's odd. It seems odd to me, but that's the only way I can make sense of that 717E2. E1 and D2. Yes, Your Honor. There is some vagueness, perhaps, in the law, and it's a sufficiently recent law that there also hasn't been a tremendous amount of case law. Are there parallels to this anywhere that come to your mind that serve as a reasonable analogy for us to understand how this works in other regulatory matters that call into place state activity in a federal permitting process? Your Honor, off the top of my head, I can't think of one, but I will point, Your Honor, to the decision by the D.C. Circuit in Weaver's Cove that talks about the right way for this to proceed and talks about the jurisdictional problems of if ultimately your problem is here, which Constitution's problem is with CORE accepting that no certification exists. That's how the whole standing argument got made because it said you're not injured until the CORE denies the permit. Yes, and the CORE here has effectively denied the permit, so the injury that Constitution has is against the CORE, and the fact that it's been injured by the CORE does not create a case or controversy against D.E.C. on the waiver issue. On the merits claim, that's a separate thing and is very much properly in front of this circuit. If I may very quickly, Your Honor, I realize I'm out of time. Just take a minute to wind up. Yes, I just wanted to make one final concluding point, which is on the question of the remedy that Constitution has asked for here if this court were to side with it on the merits. The remedy that the Constitution is asking for is wholly inappropriate and does not square with what this court has held in Islander East 1 in particular, which you can't pick up a draft permit from more than a year ago and order D.E.C. to somehow run with it. The appropriate remedy here would be for this court to, as it did in Islander 1, remand to D.E.C. with the instructions to provide additional explanation, and the multiple remedies that Constitution has asked for here just are unsupported and frankly flatly contrary to the binding precedent in this court. We also raise a number of other issues, Your Honors, in our papers, and I would just point the court both to our papers as well as the papers filed by the D.E.C. and ask this court to reject all of Constitution's claims and uphold the D.E.C.'s denial of the 401 certification. Thank you very much. Thank you. Mr. Stoviak, you've got a couple of minutes. Thank you, Your Honors. First off, in Islander East, number one, there was no draft permit like there is here, certainly nothing. There just wasn't a draft permit unlike the one here. Secondly, I want to take a minute, if I can, of this to go back and talk about the information that they had. They had information they could not formulate conditions. Well, the draft permit shows they could formulate conditions. They had a chart with 19 streams that it says on page JA-2237, it says these are the streams requiring trenchless crossing methods, and it lists them specifically. That's right in their draft permit that they sent not just internally and kept secret, but they sent it to the Army Corps of Engineers for their comments. Secondly, on turbidity, at pages 8 and 9 of the draft permit, they have conditions about turbidity, which they certainly, that is an EPA-approved water quality standard. They can impose conditions on that, and they laid out conditions on JA-2228 and 2229 on turbidity. Secondly, they ignore the fact that the Federal Energy Regulatory Commission disagreed with them in their rehearing order. It said, we disagree that the final EIS for the Constitution pipeline was based on inadequate information. There's a federal agency that's had nine comment letters from the Department of Environmental Conservation, had comments from all the interveners here and a variety of other people, and they determined they had adequate information. That's at paragraph 43 of the rehearing order. In terms of the trenchless crossings, the Federal Energy Regulatory Commission, in their certificate order in December 2014, pointed out that there was appropriate use of trenchless crossing methods to cross water bodies and implementation of mitigation methods outlined in Constitution's Environmental Construction Plans, which DEC had, and other project-specific plans will avoid or adequately minimize impacts on surface water resources. And they referenced 21 crossings there. That's at paragraph 77 of the certificate order. So you have a record where they had this information. There's no doubt about that, yet they made a denial. They chose not to impose a condition or deny because we couldn't meet the conditions. They said, we don't have enough information. That was their choice. Niagara-Mohawk is still good law, at least as recognized by the appellate division in New York that issued its decision in 2007 in the East Niagara Power Project Alliance after S.D. Warren, after HUD No. 1. Thank you, Mr. Stobiak. If I could take one second on the waiver since everybody's talked about that, and Judge Wesley has sensed a little bit of my concern about the waiver. You're using your one second right now. Here's the argument. They determined that the application was complete, December 24, 2014. They asked us to resubmit the application because of winter delays for their press release, which is in the record, and we resubmitted it on April 27, 2015 with no modifications and a statement in DEC's press release that it would not unduly delay the process. There is no action for another 10 months. The 60 days that the Army Corps has for doing it should have run from April 27, 2015. Our position is that they did not act in a reasonable period of time, and therefore they've waived. The reason we don't go to the D.C. Circuit is if we go to the D.C. Circuit, there's no failure to act because they actually denied. They've actually denied the Water Quality Certificate, so the D.C. Circuit would send us back here. Thank you. Thank you, Your Honors. We'll reserve decision.